IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UGENIO DEJESUS RUBY-RUIZ, #517379, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 3:23-cv-00274 |
| SHARON ROSE, | ) ) | JUDGE CAMPBELL |
| Respondent. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Ugenio DeJesus Ruby-Ruiz was convicted in Tennessee state court of three counts of soliciting sexual exploitation of a minor, six counts of aggravated sexual battery, and nine counts of rape of a child. He has filed a 28 U.S.C. § 2254 Petition for a Writ of Habeas Corpus challenging his custody pursuant to those convictions. (Doc. No. 1). For the reasons below, the Petition will be denied.

### I. PROCEDURAL HISTORY

#### A. Trial and Direct Appeal

Petitioner was convicted of committing several offenses against his then-stepdaughter, A.M, from the time she was approximately 9 years old until she was 13, and against A.M.'s friend, A.T, when she was in fifth grade. (Doc. No. 12-12 at 2−5); *State v. Ruby-Ruiz*, No. M2013-01999-CCA-R3-CD, 2015 WL 2227933 (Tenn. Ct. Crim. App. May 12, 2015). The court sentenced Petitioner to a total effective prison term of 121 years. (*Id.* at 9−10).

Petitioner filed a motion for new trial arguing nine bases for relief. (Doc. No. 12-1 at 123−25). The trial court denied the motion. (*Id.* at 157−60).

1

On direct appeal, Petitioner argued that the trial court erred in ordering consecutive sentences, that consecutive sentences were unjustly deserved in light of the seriousness of Petitioner's offenses, and that the evidence was insufficient to support his convictions. (Doc. No. 12-10 at 4, 9−13). The Tennessee Court of Criminal Appeals affirmed. (Doc. No. 12-12 at 11). Petitioner filed an untimely application for permission to appeal, which the Tennessee Supreme Court denied. (Doc. Nos. 13, 14).

B.     **State Post-Conviction Proceedings**

Petitioner next filed a pro se petition for state post-conviction relief (Doc. No. 13-1 at 64−86), which was later amended by counsel (*id.* at 92−105). During post-conviction proceedings, the Tennessee Court of Criminal Appeals granted Petitioner leave to file a delayed application for permission to appeal to the Tennessee Supreme Court on direct appeal. (Doc. No. 13-21). The Tennessee Supreme Court denied permission to appeal. (Doc. No. 12-19).

As relevant to these proceedings,[1] Petitioner raised the following issues in his post-conviction petition:

- trial counsel was ineffective for failing to file a pretrial motion to sever offenses ; and
- appellate counsel was ineffective for failing to argue several issues raised in Petitioner's motion for new trial.

(Doc. No. 13-1 at 92−105). The trial court denied relief. (Doc. No. 13-1 at 111−19; Doc. No. 13-22 at 82−83).

On post-conviction appeal, Petitioner argued that direct appeal counsel was ineffective for failing to cite the record on appeal and for failing to argue the grounds that had been presented in

---

[1] The procedural history on post-conviction review is extensive. The Court here limits its recitation of the procedural history to those issues pertinent to the 28 U.S.C. § 2254 Petition. The Tennessee Court of Criminal Appeals opinion in Petitioner's final post-conviction appeal includes a more detailed summary of the procedural history. (Doc. No. 13-26 at 6−13).

2

Petitioner's motion for new trial. (Doc. No. 13-24 at 26−31). The Tennessee Court of Criminal Appeals affirmed, finding that Petitioner had failed to demonstrate prejudice. (Doc. No. 13-26 at 14−17); *Ruby-Ruiz v. State*, No. M2022-040442-CCA-R3-PC, 2023 WL 1319576 (Tenn. Ct. Crim. App. Jan. 31, 2023). The Tennessee Supreme Court denied Petitioner's application for permission to appeal. (Doc. No. 29).

C. **Federal Section 2254 Proceedings**

Petitioner filed a Section 2254 petition for writ of habeas corpus in this Court on March 28, 2023. He contends that

(1) trial counsel was ineffective for failing to file a pretrial motion to sever offenses for separate trials; and

(2) appellate counsel was ineffective for failing to argue five unspecified issues that were raised in Petitioner's motion for new trial.

(Doc. No. 1 at 5−7; *see* Doc. No. 2 at 26−40).

Respondent has filed an Answer (Doc. No. 16), and Petitioner has filed a Reply (Doc. No. 19). The petition is now fully briefed.

II. **SUMMARY OF THE EVIDENCE**

A. **Trial Evidence**

The Tennessee Court of Criminal Appeals on direct review summarized the trial evidence as follows:

> [A.M.] testified that she was 15 years old at the time of trial. Defendant was her stepfather, and she called him "dad." She lived with her mother, her siblings, and Defendant. A.M. testified that Defendant began sexually abusing her when she was eight or nine years old.
>
> A.M. testified that on one occasion, she walked in on Defendant watching pornography on television. She saw Defendant sitting on the couch, and he was masturbating. She testified that Defendant told her to watch it with him, but she went to her bedroom instead. Defendant followed her. She testified that Defendant touched her "private parts" over her clothing. A.M. recalled another incident when she and Defendant were in Defendant's bedroom. She testified, "I guess he just felt

3

like doing it. And like—I guess he just felt like having sex so he told me if I wanted to. And I guess I just didn't want to argue so I just let him." She agreed to have sex with Defendant and unclothed herself. She testified that Defendant penetrated her anally. A.M. specifically remembered the occasion because her mother came home from the grocery store during the incident, and she quickly dressed herself. She testified that Defendant had previously had anal sex with her. She testified that the first time it hurt, and Defendant told her that it would not hurt the next time.

A.M. recalled another incident in the living room when Defendant was watching pornography. She saw "half-naked" girls dressed as clowns touching each other's private parts. She testified that she sat on the couch beside Defendant, and Defendant began touching her private parts over her clothing. She testified that Defendant was touching his penis, and he asked her to touch his penis. Defendant then ejaculated. A.M. testified that Defendant wiped semen off his penis with a paper towel. She testified that Defendant had wiped "sperm" off his penis with a paper towel on several other occasions.

A.M. testified that Defendant also touched her private parts on several occasions in her bedroom, but she did not recall any specific incidents. A.M. recalled that Defendant touched her private parts over her clothing and under her clothing. Defendant would sometimes put his hand under her clothes.

A.M. testified that on occasions when she "would deny him" sex, Defendant would put his penis in her mouth. Defendant also put his mouth on her breasts. A.M. testified that when her family moved to "the yellow house," Defendant was having sexual encounters with her "two times a week." A.M. recalled the first time Defendant tried to have vaginal intercourse with her. She testified that she and Defendant were the only people in the house. A.M. was laying on Defendant's bed. Defendant told her to take her clothes off because "he wanted to stick it in [her] vagina." She told Defendant that it hurt, and Defendant told her that it would only hurt the first time. A.M. testified that she cried. She testified that her mother arrived home, and A.M. ran to the bathroom because she was bleeding. She testified that her mother believed A.M.'s menstrual cycle had started because she was bleeding.

A.M. recalled another occasion Defendant penetrated her vaginally. She testified that she was watching television in Defendant's bedroom while she waited for her mom to return home from work. Defendant told her that he wanted "to do it again[,]" and A.M. refused because her mother would be home soon. A.M. testified, "he told me it was going to be quick. So I just got tired of saying no because I know he wouldn't understand." A.M. removed her clothes and spread her legs open. Defendant tried to put his penis in her vagina, and A.M. told him to stop because it hurt. She testified, "I told him, no, because it did hurt and he did it anyways. I guess he didn't care." She believed that she was in the fifth or sixth grade at that time.

A.M. testified about one incident when they were in the living room. Defendant was sitting on the couch, and A.M. was kneeling on the floor. Defendant put his penis in her mouth and then ejaculated onto a piece of paper. A.M. recalled another

4

incident when she was taking a shower, and Defendant got in the shower with her and "showed [her] his penis." Defendant touched A.M.'s private parts and told her to put her mouth on his penis. Defendant told A.M. that he would give her money if she put her mouth on his penis. A.M. testified that the incident ended when she heard her brother in the house.

A.M. testified that "most often" the sexual encounters would happen in Defendant's bedroom. She testified that it happened "a lot." She recalled another incident when she was in fifth grade, and her friend A.T. was visiting. They were wearing their bathing suits in the bathtub, and Defendant came into the bathroom and exposed his penis to them. A.T. left the bathroom, and Defendant then put his penis in A.M.'s mouth. A.M. testified that on two other occasions when A.T. was visiting, Defendant called them over to watch pornography with him. A.M. testified that she asked A.T. not to tell anyone about the incidents.

A.M. recalled an incident when Defendant's niece was visiting. Defendant gave his niece money to leave the room, and Defendant then told A.M. to put her mouth on his penis. A.M. testified that Defendant was sitting on the couch, and A.M. was kneeling on the floor. She also recalled an occasion when her mother went to a party, and A.M. "thought the same thing's going to happen that always happens when nobody's around. . . . Have sex with [Defendant]." A.M. testified that Defendant was mostly having vaginal intercourse with her by that time.

A.M. testified that when she was thirteen years old, her youngest sibling was born. A.M. recalled an occasion when she went into Defendant's bedroom to give the baby a bottle, and Defendant told her to give the baby to another sibling. Defendant then told A.M. that he wanted to have sex, and A.M. took her clothes off and laid on Defendant's bed. She testified, "I couldn't say anything because I would be mad because I would get so tired of it. And so I would just let him do it, what he needed to do." She testified that Defendant penetrated her vaginally, and the encounter ended when her sister knocked on the bedroom door. A.M. also recalled an incident just before her youngest sibling was born when Defendant put his penis into her mouth while they were in the living room. She testified that her sister watched the incident.

A.M. testified that Defendant told her that she "shouldn't tell because he would go to jail and what would happen to [A.M.'s] little brothers." Defendant also told A.M. that she was prettier than her mother and that he had sex with A.M. because A.M.'s mother would not have sex with him. Defendant told A.M. that he loved her and he wanted to marry her. Defendant used his cell phone to take photographs of A.M.'s naked body. He also showed A.M. a photograph of her mother's naked body on his phone and told A.M. that her breasts looked better than her mother's breasts. A.M. testified that Defendant also used his phone to take video of her performing oral sex on him, but he did not show the video to A.M. A.M. also testified that Defendant gave her money, a camera, and allowed her to go places in exchange for sexual acts.

In February 2011, A.M. began running away from home. She recalled an incident on a Sunday in March 2011. She was in the eighth grade. After having sex with Defendant, A.M. left the house to go stay with her boyfriend, F.R., with whom she testified she had a consensual sexual relationship. While she was staying with F.R., she told him that Defendant was sexually abusing her. She stayed at F.R.'s house for approximately one week.

The police came to F.R.'s house. A.M. was hiding in a closet when the police arrived. F.R. encouraged A.M. to tell the police about the sexual abuse. A.M. testified that she was afraid of how her mother would react. She testified that she initially lied to the police about having had sex with Defendant because she was embarrassed. She also did not tell police that she had sex with F.R. She testified that she did not tell police that she took her clothes off when Defendant asked to have sex with her because she did not want them to think that the sexual abuse was her fault. She testified that she "got tired . . . [o]f [Defendant] always wanting to do it and taking off [her] clothes[,]" so she took her clothes off instead.

[A.M.'s friend] A.T. testified that she became friends with A.M. in fifth grade. She testified that the first time she went to A.M.'s house, she saw Defendant watching pornography in the living room. She testified that Defendant "just looked [at A.T. and A.M.] and smiled casually." She testified that she saw two people having sex on television. A.T. also testified that on another occasion, she and A.M. were in the bathtub, and they were wearing bathing suits. Defendant got into the bathtub with them. Defendant was wearing underwear. Defendant asked A.M. in Spanish to give him oral sex, and he removed his underwear. A.T. left the bathroom. A.M. told A.T. not to tell anyone about the incident because her mother would not believe her and Defendant would go to jail. On another occasion, Defendant called A.T. and A.M. into his bedroom. Defendant was watching pornography and masturbating under the covers. Defendant asked A.M. to sit with him on the bed, and she agreed. A.T. stopped visiting A.M.'s residence when she was in the sixth grade because her family moved, and she changed schools. She also testified that her mother was not comfortable with Defendant watching her.

F.R. testified that he and A.M. began dating when A.M. was 13 years old. F.R. was 16 years old. He testified that in March 2011, he and A.M. were driving to a friend's house. A.M. was being unusually quiet. F.R. asked A.M. if Defendant had sexually abused her, and A.M. answered affirmatively. A.M. asked F.R. not to tell anyone because she was afraid "her family [wa]s going to fall apart." A.M. stayed at F.R.'s house the following week until police came to his house looking for A.M. F.R. admitted that he had been adjudicated delinquent for theft and aggravated burglary.

Detective Jeff Gibson testified that A.M.'s mother reported her as a runaway in March 2011. Detective Gibson located A.M. at F.R.'s father's house. He found A.M. hiding in a closet. She was crying and "very passionate about not wanting to go home." A.M. disclosed sexual abuse to another officer, and Detective Mayo contacted the sex crimes division. Detective Jason Mayo was assigned to

investigate the allegations in this case. Detective Mayo interviewed A.M. Based on his interview of A.M., he arranged for a forensic interview at the Child Advocacy Center. Detective Mayo contacted A.M.'s mother. A.M.'s mother and Defendant arrived at the police station. Detective Mayo then interviewed Defendant. Defendant initially denied that he had touched A.M. or had sex with A.M. Defendant then told Detective Mayo that he had sex with A.M. one time but that A.M. had initiated it. Detective Mayo requested that another officer search Defendant's cell phone. Detective Chad Gish searched Defendant's phone for photos of A.M. and her mother. Detective Gish found a photo of a woman's breasts on Defendant's phone, but he did not find any nude photos of A.M.

Reda Williams, a home healthcare provider, testified that she provided care for Defendant's special needs son. She began working with the family in 2010, and she worked with the family for approximately one year. She testified that she was at the residence four or five days per week from approximately 3:00 p.m. until 9:00 or 11:00 p.m. and on the weekends as needed. Ms. Williams testified that she never saw Defendant watching pornography or behaving inappropriately.

(Doc. No. 12-12 at 2−6); *State v. Ruby-*.

The jury found Petitioner guilty of three counts of soliciting sexual exploitation of a minor; six counts of aggravated sexual battery; nine counts of rape of a child; one count of especially aggravated sexual exploitation of a minor; and two counts of rape. (Doc. No. 12-12 at 1).

### B. Post-Conviction Hearing

The Tennessee Court of Criminal Appeals summarized the evidence introduced during postconviction hearings as follows:

> At the February 3, 2017 post-conviction hearing, trial counsel testified that she began representing the Petitioner in July 2012, about six months before the January 2013 trial. She said that the Petitioner spoke Spanish, that she spoke Spanish well, that sometimes she met with the Petitioner alone, and that sometimes she and a Spanish-speaking investigator met with the Petitioner. She did not suspect a communication problem between her and the Petitioner. Counsel estimated meeting with the Petitioner ten to fifteen times before the trial. Counsel said that the previous attorney who represented the Petitioner had filed a motion for discovery, that the State had responded to the motion, and that she did not recall providing the discovery materials to the Petitioner. She said that, in similar cases, she advised a client not to keep discovery materials at the jail because the subject matter created a risk to the client's safety. She said, though, that she and the Petitioner reviewed the discovery materials.

7

Trial counsel testified that she reviewed the video recordings of the forensic interviews and that although she did not recall viewing the recordings with the Petitioner, she would have told the Petitioner about A.M.'s and A.T.'s statements. Counsel said that the Petitioner participated in his defense, asked questions, and provided his thoughts on how to proceed. She recalled that the Petitioner suggested contacting the nurse who testified for the defense at the trial and a teacher to whom A.M. was alleged to have recanted. Counsel said that although the Petitioner did not know the teacher's name, the Petitioner directed counsel to speak with the Petitioner's former wife. Counsel said that she spoke to the former wife on the telephone and that counsel determined the former wife would not have been a useful witness. Counsel thought that she and the Petitioner discussed her determination, although she did not recall specifically. Counsel said the former wife believed that A.M. lied about "small things" but not about "big things," could not recall the names of A.M.'s teachers, and had not seen inappropriate behavior between the Petitioner and A.M.

Trial counsel testified that the Petitioner doubted the credibility of the witnesses. Although she did not recall discussing her trial strategy with the Petitioner, she said they discussed whether he would testify, engaged in mock questioning, and came to a "joint decision" that his testifying would have been a "bad idea." Counsel agreed the defense was that the allegations were fabricated. She thought that the Petitioner mentioned a neighbor who could have been a defense witness but that she was unsure. She did not recall talking to a neighbor. She said that the State extended a plea offer of twenty years at 85% and that the defense presented a counteroffer of ten years at 30%. She did not recall whether the State offered twelve years at 30%, but she did not dispute an offer was made if her file reflected it. She recalled that the Petitioner rejected the twenty-year offer and said that if the Petitioner had expressed interest in accepting an offer that had been withdrawn, she would have attempted to convince the prosecutor to allow the Petitioner to accept it.

Trial counsel testified that the Petitioner spoke to the Petitioner's former wife during his incarceration and that the communication ended after the former wife moved to Georgia. Counsel did not recall a jail telephone call among the Petitioner, the former wife, and A.M. in which A.M. recanted her allegations. Counsel did not recall a discussion during which the Petitioner told counsel that his former wife and A.M. were going to sign an affidavit reflecting A.M.'s recantation. Counsel did not recall DNA evidence implicating the Petitioner, although the police attempted to "bluff" him during the interview. Counsel did not consider filing a motion to sever any particular count in the indictment.

On cross-examination, trial counsel testified that she would have filed a motion to sever a particular indictment count if she had determined severance was warranted. She said that a severance hearing was held relative to the offenses involving the two victims.

The Petitioner testified that he and trial counsel communicated in Spanish. He agreed counsel discussed with him the State's evidence, his constitutional rights,

8

what would occur at the trial, and whether he would testify at the trial. He said that counsel came to the jail to meet with him but that he met with counsel mostly at the courthouse.

The Petitioner testified that he rejected the State's plea offer because he was innocent and because the proof against him was weak. He said that the last offer extended by the State was twelve years at 85% service. When the post-conviction court asked why he did not accept this offer, the Petitioner said that when trial counsel informed the prosecutor of the Petitioner's desire to accept the offer, the prosecutor stated that the offer had been withdrawn because the prosecutor was prepared for the trial. The Petitioner said counsel anticipated that he would be convicted at the trial and that the trial court would impose a lengthy sentence. He said that after this conversation, he wanted to accept the twelve-year offer that had been withdrawn by this time, which he said was about one year before the trial.

The Petitioner testified that he was not provided any documents to review from the discovery materials and noted that he did not speak or read English. He denied trial counsel read the materials to him but said that counsel reviewed each charge contained in the indictment and the "exposure of each one of those charges." He said that counsel reviewed the victims' allegations and told him that the evidence was strong. He said that counsel always changed the subject when he questioned the victims' statements. He said that he did not know a victim's testimony was sufficient evidence for a conviction and that he thought a conviction required three or four witnesses. He did not recall reviewing information from the Department of Children's Services (DCS) but said he told counsel about A.M.'s previous involvement with DCS beginning at age twelve. The Petitioner recalled that A.M. ran away from home to spend time with her friends and was "aggressive with her mother." He said that he told counsel about these incidents but that counsel did not obtain the DCS records. He believed the records would have benefited his defense because DCS questioned A.M. extensively about the cause of her behavior and that she never mentioned any sexual abuse.

The Petitioner testified that trial counsel discussed the trial process and whether he should testify. He said that counsel advised against his testifying, although he wanted to testify. He said that although counsel testified that they both agreed he should not testify, he told counsel that she would decide what was best for him. He said counsel did not tell him that he did not have to follow her advice about his testifying. He said that he wanted counsel to call "witnesses and talk to certain people," including "the nurse" and "the neighbor," but that counsel did not attempt to contact them until three days before the trial. He agreed the nurse testified at the trial.

The Petitioner testified that he did not understand the charges involved two victims. He said that he and trial counsel discussed severing charges related to A.M. but that counsel said it would have taken a very long time to try each count separately. He said that he communicated with his former wife during his pretrial confinement and that she reported A.M. was a "rebel," who ran away from home and denied telling

9

a teacher she lied about the allegations to help her boyfriend. The Petitioner said he was arrested in 2011 and that his and his former wife's conversations occurred in 2011, a few months into his pretrial incarceration. He said that he told counsel about the conversations and that he might have told a previous attorney about them. The Petitioner said that he "insisted" counsel present his former wife as a defense witness but that counsel did not. He recalled counsel's excuses for not presenting his former wife at the trial, which included the cost of traveling from out of state and his former wife's failure to answer the telephone when counsel called. He disagreed with counsel that his former wife would have been an unfavorable defense witness because she knew he was innocent.

The Petitioner testified that he retained appellate counsel, that they never met personally, and that counsel wrote him a letter after he complained to the Board of Professional Responsibility. The Petitioner recalled that counsel's letter came about one year after counsel was retained. The Petitioner said that he had not seen the motion for a new trial that appellate counsel prepared and that they did not discuss the issues raised in the motion. The Petitioner said that they did not discuss the appellate brief filed by counsel and that counsel did not provide him with a copy.

The Petitioner testified that he attempted to speak with appellate counsel by telephone many times but that counsel's administrative assistant always said counsel was out of the office. The Petitioner said he sent counsel five to seven letters but never received a response. He said counsel charged $10,000 to appeal his convictions and to file an application for permission to appeal in the supreme court. He said counsel failed to file a timely application for permission to appeal.

On cross-examination, the Petitioner testified that trial counsel believed the State had strong evidence against him. He agreed that counsel presented the nurse and the neighbor as defense witnesses but said that counsel did not present his former wife. The Petitioner agreed the evidence showed that his former wife was not present when the offenses occurred and that the incidents occurred during a long period of time. He said that he did not know the teacher's name who could have testified that A.M. lied about the allegations, that he told counsel to "pull the recordings," that counsel did not obtain them, and that the Petitioner had not identified the teacher.

Appellate counsel testified that initially he worked for the public defender's office but that he moved to private practice about three years before taking the Petitioner's case. He said most of his work was criminal defense, although he did not have much appellate experience at this time. Counsel said that he consulted an assistant public defender, who "guided" counsel through the appellate process.

Appellate counsel testified that he represented the Petitioner at the motion for new trial hearing. Counsel said that although trial counsel also filed a motion for a new trial, he filed his motion, that both motions raised the same issues, and that one motion was "struck" from the record. Counsel said that he spoke with trial counsel about the case and the trial, that he probably reviewed the trial court file, and that

10

he reviewed the transcripts. He identified the appellate brief and the motion for a new trial he filed. He said that before deciding which issues to raise on appeal, he and the Petitioner met at the prison to discuss which issues were most likely to garner relief. Counsel said that because the severance issue from the motion for a new trial was not raised on appeal, he must have concluded that it was not important and was unlikely to warrant relief. He said that he could not recall if he provided the Petitioner with a copy of this court's opinion in the previous appeal but that if he did not provide a copy, it was because possession of documents related to sexual offenses posed a safety threat to the Petitioner.

Appellate counsel testified that he did not cite to the record in the brief and that this court noted the lack of citations in its opinion. He agreed his argument for sufficiency of the evidence was short and did not include citations to legal authority. He agreed that his application for permission to appeal was untimely and that the supreme court denied his motion to consider the untimely application and dismissed the application.

Appellate counsel testified that after he and the Petitioner met at the prison, the Petitioner wrote one or two letters to which counsel responded and that they talked by telephone a couple of times. Counsel said that the Petitioner sent a "barrage of letters," in which the Petitioner accused him of taking the Petitioner's money when counsel was "in cahoots" with the prosecutor. Counsel did not respond to those letters. Counsel said that he likewise stopped taking the Petitioner's calls because the Petitioner only wanted "to fuss" at him. Counsel said that the Petitioner filed a complaint with the Board of Professional Responsibility, which directed counsel to respond to the Petitioner's letters. Counsel said he responded, although the Petitioner's letters became increasingly hostile. Counsel denied that he did not communicate any information to the Petitioner. Counsel said that he provided the Petitioner with the appellate brief but that he did not recall specifically sending a copy to the Petitioner.

(Doc. No. 13-26 at 7−12).

### III. GOVERNING STANDARDS

A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA creates both procedural and substantive limits on the Court's authority to grant habeas corpus relief for a petitioner in custody pursuant to a state court judgment. The Court sets forth the standards applicable to this Petition below.

### A. Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). If a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is "technically exhausted" but procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. *Sutton v. Carpenter*, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014). In Tennessee and many other states, a petitioner who raises a procedurally defaulted claim alleging ineffective assistance of trial counsel may demonstrate cause by showing that postconviction counsel was ineffective for failing to raise the claim in initial state postconviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial

claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make unlikely a meaningful opportunity to raise ineffective assistance claim on direct appeal); *Sutton*, 745 F.3d at 795−96 (holding that *Martinez* and *Trevino* apply in Tennessee). The *Martinez* exception does not apply to "attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." 566 U.S. at 16.

### B. Merits Review

Under the AEDPA, a federal court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court only if that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

If a claim was not adjudicated on the merits in state court, this Court applies the "pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011); *see* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

### C. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees to a person accused of a crime the right to effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694−95 (2002). Counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686−87 (1984). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### IV. ANALYSIS

Petitioner asserts that trial counsel was ineffective for failing to file a pretrial motion to sever and that appellate counsel was ineffective for failing to raise five unspecified issues presented in the motion for new trial. Respondent argues that the ineffective-assistance-of-trial-counsel ground is procedurally defaulted because Petitioner did not raise it on post-conviction appeal and that the ineffective-assistance-of-appellate-counsel claim does not warrant habeas relief under Section 2254(d). The Court addresses Petitioner's grounds in turn.

#### A. Ineffective Assistance of Trial Counsel

In his post-conviction petition, Petitioner argued that trial counsel was ineffective for failing to file a pretrial motion to sever. (Doc. No. 13-1 at 100−04). However, he did not raise this as a ground for relief on appeal from the denial of post-conviction relief. (*See generally* Doc. No. 13-24). This ground is therefore procedurally defaulted. *Adams*, 330 F.3d at 401.

Petitioner concedes the default but argues that it occurred at the post-conviction trial level because counsel failed to present sufficient evidence at the post-conviction hearing to support the claim, effectively failing to fairly present the claim.[2] (Doc. No. 19 at 5). Petitioner cites no controlling authority for finding a procedural default in such circumstances. (*See id.* at 6−8 (citing only a dissent from the denial of certiorari)). However, the Court need not decide whether a claim might hypothetically be defaulted under such circumstances, because the record here belies Petitioner's argument. Both post-conviction counsel and the State questioned trial counsel at the post-conviction hearing about trial counsel's decisions regarding the pretrial motion to sever. (Doc. No. 13-2 at 19−21). And the post-conviction trial court adjudicated Petitioner's ineffective-assistance-of-trial-counsel claim on the merits, crediting trial counsel's testimony and concluding that Petitioner had failed to meet his burden of proof. (Doc. No. 13-1 at 117−18; *see id.* at 112 n.2 ("There was no legal basis for filing a motion for severance nor for the Court to grant such a motion.")).

Petitioner did not procedurally default his ineffective-assistance-of-trial-counsel claim at the post-conviction trial court level. He defaulted it at the post-conviction appellate court level. As such, Petitioner cannot rely on ineffective assistance of post-conviction counsel to excuse the default. *Martinez*, 566 U.S. at 16 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings."). The ineffective-assistance-of-trial-counsel claim will therefore be denied based on procedural default.

---

[2] If the ineffective-assistance-of-trial-counsel ground was defaulted at the post-conviction trial stage, then Petitioner could seek to excuse the default under *Martinez*.

## B. Ineffective Assistance of Appellate Counsel

Petitioner argues that direct appeal counsel was ineffective for failing to brief five of the nine issues raised in his motion for new trial. (Doc. No. 1 at 7; Doc. No. 2 at 32). Petitioner is not entitled to habeas relief on this ground, because the Tennessee Court of Criminal Appeals reasonably concluded that Petitioner failed to demonstrate prejudice.

The Tennessee Court of Criminal Appeals reasoned as follows:

> In his appellate brief, the Petitioner asserts that appellate counsel provided ineffective assistance because appellate counsel failed to "include additional, meritorious issues in his brief and this failure, in part, constituted prejudice required under *Strickland*." The Petitioner, likewise, states in his brief that "while [he] could brief each and every issue that was omitted citing persuasive authority for each, there is most likely contrary authority on some issues as well, however, it is not the place of a post-conviction appeal to litigate issues that should have been addressed on appeal" from the conviction proceedings. However, without litigating in the post-conviction court the issues the Petitioner claims would have entitled him to relief if appellate counsel had raised them on appeal, the Petitioner is unable to establish appellate counsel provided any deficient performance resulting in prejudice.

(Doc. No. 13-26 at 16).

This conclusion is a reasonable application of *Strickland*'s prejudice prong. Petitioner bore the burden of demonstrating that appellate counsel's performance prejudiced him. *Hale v. Cool*, 122 F.4th 637, 646 (6th Cir. 2024) ("When bringing a *Strickland* claim, a defendant bears the burden of showing that his counsel's performance was deficient, and that this deficiency prejudiced the defense."). To do so, he must show a reasonable probability of a different outcome on appeal. But in state post-conviction proceedings and in this Court, Petitioner has failed to articulate, let alone demonstrate, a reasonable probability that any specific issue raised in his motion for new trial would have succeeded on direct appeal.[3] (*See* Doc. No. 13-24 at 31) (Petitioner arguing on

---

[3] Indeed, Petitioner does not even identify which five of the nine grounds raised in the motion for new trial should have been raised on appeal. (*See* Doc. No. 1 at 7; Doc. No. 2 at 32−40; Doc. No. 19 at 9−16).

post-conviction appeal that while he "could brief each and every issue that was omitted citing persuasive authority for each, there is most likely contrary authority on some issues as well, however, it is not the place of a post-conviction appeal to litigate issues that should have been addressed on appeal."). The Tennessee Court of Criminal Appeals therefore reasonably held that Petitioner failed to demonstrate prejudice from counsel's performance on direct appeal, so habeas relief is unavailable on this ground under Section 2254(d).

## V. CERTIFICATE OF APPEALABILITY

Because Petitioner has failed to demonstrate that he is entitled to relief under 28 U.S.C. § 2254(d) as to any of his claims, the Petition will be denied.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas corpus petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El V. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Here, because jurists of reason would not disagree with the Court's resolution of Petitioner's claims, the Court will deny a certificate of appealability. However, Petitioner may seek a certificate of appealability from the Sixth Circuit.

17

Case 3:23-cv-00274   Document 20   Filed 02/18/26   Page 17 of 18 PageID #: 1699

## VI. CONCLUSION

For the reasons set forth above, Petitioner's 28 U.S.C. § 2254 petition for a writ of habeas corpus is **DENIED**, and this action is **DISMISSED** with prejudice. The Court **DENIES** a certificate of appealability.

This Order resolves all claims in the action. The Clerk shall enter Judgment in accordance with Rule 58(b)(1) of the Federal Rules of Civil Procedure.

The Court certifies that any appeal from this judgment would not be brought in good faith, because Petitioner has not articulated any objectively nonfrivolous grounds for habeas corpus relief. *See* Fed. R. App. P. 24(a)(3)(A).

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE